AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2017 SEP 18 PM 2: 49

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

SHARON L. OVINGTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with the Google account<br>laithelibini90@gmail.com, that is stored by Google Inc. | )<br>)<br>)<br>)<br>) Case No.  3 : 17 mj 436 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2339B | Attempting to Provide Material Support and Resources to a Foreign Terrorist<br>Organization |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Herwig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/18/17

*Judge's signature*

City and state:  Dayton, Ohio

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael Herwig, being duly sworn, depose and state the following:

### INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been an agent since March 16, 2008.  I have been assigned to the Joint Terrorism Task Force since 2008 and have worked cases involving international and domestic terrorism.

2.     I make this affidavit in support of an application for a search warrant for information associated with the account **laithelibini90@gmail.com** ("SUBJECT ACCOUNT"), as more fully described in Attachment A, which is stored at premises controlled by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

3.     Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign terrorist organization) have been committed by **LAITH WALEED ALEBBINI** ("**ALEBBINI**"), and that there is probable cause to believe that evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B, are present within the information associated with the SUBJECT ACCOUNT.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

### JURISDICTION

5.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

1

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL STATUTES AND DESIGNATIONS

6.      Title 18, United States Code, Section 2339B, prohibits, in pertinent part, a person

from knowingly providing "material support or resources to a foreign terrorist organization," or

attempting or conspiring to do the same.

7.      The term "material support or resources" means any property, tangible or

intangible, or service, including currency or monetary instruments or financial securities,

financial services, lodging, training, expert advice or assistance, safehouses, false documentation

or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel…, and transportation, except medicine or religious materials." 18 U.S.C. Section

2339A(b)(1) and Section 2339B(g)(4). Section 2339B(h) provides that "[n]o person may be

prosecuted under this section in connection with the term 'personnel' unless that person has

knowingly provided, attempted to provide, or conspired to provide a foreign terrorist

organization with 1 or more individuals (who may be or include himself) to work under that

terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct

that operation of that organization. Individuals who act entirely independent of the foreign

terrorist organization to advance its goals or objectives shall not be considered to be working

under the foreign terrorist organization's direction and control."

8.      On or about October 15, 2004, the United States Secretary of State designated al-

Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist

Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a

Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.

9.     On or about May 15, 2014, the Secretary of State amended the designation of AQI

as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially

Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias

Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary of State also

added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—

which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla

al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for

Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO

listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

## BACKGROUND INFORMATION

### Definitions

10.     The following definitions apply to this Affidavit, including all attachments to the

Affidavit:

a.     "**Internet Service Providers**" or "**ISPs**" are commercial organizations

that provide individuals and businesses access to the Internet.  ISPs provide a range of functions

for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-

location of computers and other communications equipment.  ISPs can offer various means by

which to access the Internet including telephone based dial-up, broadband based access via a

digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based

subscription.  ISPs typically charge a fee based upon the type of connection and volume of data,

called bandwidth that the connection supports.  Many ISPs assign each subscriber an account

name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the

subscriber typically creates a password for the account.  By using a computer equipped with a

telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

b. An "**Internet Protocol address**", also referred to as an "**IP address**", is a unique numeric address that computers or electronic devices use in order to communicate with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address. An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone. IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. There are two types of IP addresses; static and dynamic. A static address is permanently assigned to a particular device and as a practical matter never changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the duration of the session that the client computer is connected to the Internet (or other network).

c. "**Website**" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

d. "**Uniform Resource Locator**" or "**Universal Resource Locator**" or "**URL**" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL

contains the name of the protocol to be used to access the file resource, a domain name that

identifies a specific computer on the Internet, and a pathname, a hierarchical description that

specifies the location of a file in that computer.

<u>Google Services</u>

11.     Google Inc. is a multi-national corporation with its headquarters located in

Mountain View, California.  The company specializes in Internet-related products and services,

including an Internet search engine (www.google.com), productivity tools such as email service

(gmail), and enterprise products such as Google Search Appliance.

12.     Google Photos is a photograph and video sharing and storage service provided by

Google Inc., located at photos.google.com.  It allows users to back-up their photographs and

videos so they can be accessed on any phone, tablet, or computer.  It also allows users to pool

their photographs and videos together with others into shared albums.  Photographs and videos

can be organized and searched by places and things in them.

13.     Google+ is a social networking and identity service website owned and operated

by Google Inc., located at www.plus.google.com.  Common features include the following:

a.  <u>Profiles</u>:  Users can establish profile pages to maintain personal information,
    similar to the Facebook and MySpace social networking sites.

b.  <u>Circles</u>:  Google+ allows users to establish "circles", which enables them to
    organize people into groups for sharing across various Google products and
    services.  This service replaces the typical "Friends" list function used by sites
    such as Facebook and MySpace.

c.  <u>Communities</u>:  Communities allow users with common interests to communicate
    with each other.

d.  <u>Photos</u>:  Google+ allows users to post, back-up, and share photographs.  Users
    can also make comments on photographs posted by other users.

e.  <u>Hangouts</u>:  Hangouts are places used to facilitate group video chat.  Only Google+
    users can join such chats.

      f.      <u>Messenger</u>:  Messenger is a feature available to Android, iPhone, and SMS devices for communicating through instant messaging within Circles.

14.     Google Web and App History is a feature of Google Search in which a user's search queries and results and activities on other Google services are recorded.  The feature is only available for users logged into a Google account.  A user's Web and App History is used to personalize search results with the help of Google Personalized Search and Google Now.

15.     Google Play, formerly known as the Android Market, is the official applications store for Android smartphones and tablets.  Google makes software applications, music, movies, and books available for purchase and download through the store.  Google play allows users of Android devices to purchase, download, and install applications from Google and third-party developers.

16.     Location History is a feature on Google accounts that affects all devices.  When enabled, Location History allows Google to store a record of all location data from all devices connected to a Google account.

17.     Google Drive is a file storage and synchronization service provided by Google Inc., located at www.drive.google.com.  This service provides cloud storage,[1] file sharing, and collaborative editing capabilities.  It offers 15 GB of online storage space, which is usable across Google Drive, Gmail, and other Google services.

18.     Google Android Backup is a service provided by Google Inc. to backup data connected to users' Google accounts.  The service allows users to restore data from any Google account that has been backed up in the event that the users' devices are replaced or erased.  Data

---

[1] Cloud storage is a mechanism in which files can be saved to an off-site storage system maintained by a third party – i.e., files are saved to a remote database instead of the computer's hard drive.  The Internet provides the connection between the computer and the database for

that can be backed up includes Google Calendar settings, WiFi networks and passwords, home screen wallpapers, Gmail settings, applications installed through Google Play, display settings, language and input settings, date and time, and third party application settings and data.

19.     YouTube is a video-sharing website owned by Google, Inc., located at www.youtube.com. The website allows users to upload, view, and share videos. Most of the content on YouTube has been uploaded by individuals, although media corporations such as CBS and the BBC offer some of their material via the website. Unregistered users can watch the videos, but only registered users can upload videos. Registered users can also post comments about others' uploaded videos.

<u>Email Accounts ("Gmail")</u>

20.     Google Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the account listed in Attachment A. Subscribers obtain accounts by registering with Google Inc. During the registration process, Google Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google Inc. subscribers) and information concerning subscribers and their use of Google Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

21.     A Google Inc. subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones

saving and retrieving the files.

attached to e-mails), and other files, on servers maintained and/or owned by Google Inc. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

22.      E-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

23.      E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

24.      In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing

8

inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

25.     From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following:

a.     **ALEBBINI** is a citizen of the country of Jordan.  As of April 8, 2014, he is a legal permanent resident of the United States.  Immigration records indicate that **ALEBBINI** initially arrived in the United States from Jordan on or about July 24, 2011.  He subsequently left the United States, and he returned to the United States on or about August 6, 2014, as travel records indicate that **ALEBBINI** arrived on a flight from Amman, Jordan.

b.     An individual identified herein as "Q.A." also is a citizen of the country of Jordan.  He entered the United States on a student visa, which was revoked.

c.     **ALEBBINI** is related to Q.A. and an individual identified herein as "R.A.," all three of whom were present in the Dayton, Ohio, area at various times as described below.

d.     On or about January 10, 2017, **ALEBBINI** was arrested for unlawful entry into the Turkish Embassy in Washington, D.C.  The charges against

**ALEBBINI** subsequently were dismissed. **ALEBBINI** refused to say why he was on the property, but he did say "you are going to regret this" when being escorted off the property.

e. On or about January 12, 2017, **ALEBBINI** attempted to travel to the country of Turkey via Amsterdam with R.A., but **ALEBBINI** was denied entry into Turkey because his Jordanian passport expired. **ALEBBINI** traveled with only a backpack and did not check any luggage. On or about January 15, 2017, **ALEBBINI** returned to the United States.

f. On or about January 23, 2017, **ALEBBINI** was interviewed by the FBI and the U.S. Secret Service regarding the incident at the Turkish Embassy. During the interview, **ALEBBINI** admitted posting pro-ISIS videos on his Facebook page in the past. **ALEBBINI** stated: "I am the perfect recruit for ISIS." **ALEBBINI** admitted to supporting ISIS's desire for a united Middle East, but he said he did not agree with their violence. **ALEBBINI** claimed he wanted to speak with the Turkish Ambassador to discuss the conflict in the Middle East. **ALEBBINI** said the security at the Embassy was very lax and that "[i]f I had a bomb on me, I swear to God, three embassies would have gone down."

g. **ALEBBINI** met a woman from Dayton, Ohio, who he claims to be his spouse (identified herein as "D.E."). **ALEBBINI** and D.E. claimed to have been married in a private ceremony by a man at a mosque, but it is believed they are not married pursuant to any state law or certificate. On or about March 1, 2017, **ALEBBINI** moved to Dayton, Ohio, in the

10

Southern District of Ohio, to be with D.E. From that point in time to his

arrest, **ALEBBINI** resided with D.E. in Dayton, Ohio.

h.    From approximately March 3, 2017, to his arrest, **ALEBBINI** had

multiple conversations with a Confidential Human Source ("CHS")[2] in and

around Dayton, Ohio. At times, and as described below, Q.A. and/or R.A.

were present for the discussions.[3]

i.    On or about March 7, 2017, the CHS met with **ALEBBINI**, R.A., and

Q.A. During the consensually recorded conversation, **ALEBBINI**

discussed the Jordanian pilot who was burned to death by ISIS.[4] Q.A.

stated: "one who burns by fire will be burned by it." **ALEBBINI** further

stated that he watches ISIS videos and said that ISIS follows the

"prophet," which is proven by its success on the battlefield. R.A.

expressed similar sentiments.

j.    On or about March 9, 2017, the CHS again met with **ALEBBINI**, R.A.,

and Q.A. During the consensually recorded conversation, **ALEBBINI**

---

[2] The CHS is a previously convicted felon. He/she was convicted in this Court for a weapons-related offense, as well as for benefit and wire fraud offenses. He/she has completed his/her sentence and is no longer under court supervision. The CHS hopes to receive immigration-related benefits for his/her cooperation. In this case, the FBI has paid the CHS approximately $3,500 to date, approximately $3,000 of which was to reimburse the CHS for a personal trip that the FBI requested the CHS cancel (for purposes of this case), and approximately $500 in reimbursement for other expenses incurred. In total, over the course of his cooperation in all cases, the FBI has paid the CHS approximately $18,500.

[3] Most of the conversations summarized below were conducted in the Arabic language. The summaries of, and quotes from, the conversations refer to preliminary translations provided by FBI translators. References to "Dawla," the "State," or the "Islamic State" are interpreted as referring to ISIS, which is the FTO defined above.

[4] Your affiant is aware that ISIS publicly released a video of a Royal Jordanian Air Force pilot who was captured and burned to death by ISIS members after his aircraft crashed in or around Raqqa, Syria, on December 24, 2014.

complained about the politics of Jordan and its leaders. **ALEBBINI** stated he followed the news of ISIS through "Amaq" and "Dabiq" magazines online.[5] R.A. said he read that a person was arrested after booking a one-way ticket to Turkey. R.A. also stated polls show that 98% of the Arab world supports ISIS. The group discussed what countries and groups support ISIS and how ISIS is recruiting people and obtaining weapons. At one point, **ALEBBINI** said: "You need a regime like the regime of [ISIS] right now. They come to exterminate the old regime. They don't leave anyone." **ALEBBINI** stated his Facebook account was disabled after he posted pro-ISIS videos. **ALEBBINI** said: "Allah willing, when [ISIS] comes, it will cut off the head of King Abdullah. Then it will go to free Palestine. Things will be back to normal." At **ALEBBINI**'s urging, the four individuals watched a video on YouTube that was titled: "The Islamic State, A to Z in 15 minutes."

k.    On or about March 12, 2017, the CHS again met with **ALEBBINI**, R.A., and Q.A. During the consensually recorded conversation, **ALEBBINI** stated Jordan would eventually become part of ISIS. Q.A. made a statement regarding a Jordanian soldier who was recently released from prison after murdering 7 Israeli girls in 1997. Q.A. stated: "to Hell with them, let him shoot them," while R.A. stated the murders were not justified.

---

[5] Dabiq Magazine is an online magazine published by ISIS. Amaq is an ISIS media outlet.

l.      On or about March 16, 2017, R.A. traveled from the United States to Amman, Jordan. He purchased a one-way ticket on the same day of his travel. R.A. arrived in Jordan on or about March 17, 2017.

m.     On or about March 19, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, the CHS claimed to have legal problems and to be facing deportation. Q.A. stated that the CHS should go to ISIS. **ALEBBINI** agreed that the right thing was to go to ISIS, even if the CHS did not go there to fight. Q.A. and **ALEBBINI** both spoke of the benefits of living within ISIS's borders, including cheap rent. The CHS said he was not aware of that until he saw the propaganda video. **ALEBBINI** stated he watches ISIS videos all the time and they are the "right group." He further stated he heard that ISIS and Syrian opposition groups were close to the border with Jordan. **ALEBBINI** stated that his father told him that ISIS would enter Jordan soon. When the CHS asked how to get to ISIS, **ALEBBINI** advised that he should travel through Turkey, specifically Gaziantep, a border city in Turkey. **ALEBBINI** further stated to the CHS that ISIS would welcome the CHS and not force him to fight. **ALEBBINI** stated to the CHS that he (**ALEBBINI**) would not tell anyone about their conversation (referring to their March 19, 2017 conversation). **ALEBBINI** also advised that they should hide their phones in another room, or talk in a car without the presence of phones, when they meet to talk about this topic. Later, **ALEBBINI** stated that the right place to be, from a religious point of view, is with ISIS. **ALEBBINI**

13

said that he went to a mosque and found anti-ISIS literature being distributed, and that **ALEBBINI** took the brochures to his car and then threw them in a garbage can.

n.    Later that night, on the evening of March 19, 2017, the CHS again met with **ALEBBINI** and Q.A. at **ALEBBINI**'s residence. During the consensually recorded conversation, **ALEBBINI** and Q.A. suddenly were cautious about what was discussed in front of the CHS and appeared guarded with the CHS. During the meeting, **ALEBBINI** and Q.A. made statements that were less supportive of ISIS and the idea of traveling to join ISIS.

o.    The CHS later learned that D.E. mistakenly told **ALEBBINI** that the CHS was a U.S. citizen, which made **ALEBBINI** suspicious of the CHS as potentially working with law enforcement.

p.    On March 21, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, the CHS confronted them about their suspicions. **ALEBBINI** acknowledged they were mistaken about CHS's citizenship status and apologized to the CHS.

q.    On or about March 22, 2017, the CHS had a consensually recorded phone call with **ALEBBINI**. During the call, **ALEBBINI** turned down an offer to do yard work for the CHS, claimed that he had received his tax return, and stated he would be flying back to Jordan in one week.

r.    On or about March 27, 2017, the CHS met with **ALEBBINI** at **ALEBBINI**'s residence. The conversation was consensually recorded.

14

The CHS had brought a phone to **ALEBBINI** purportedly for the purpose of having **ALEBBINI** deliver the phone to one of the CHS's family members in Jordan.  In addition:

i.      **ALEBBINI** stated R.A. is not staying in Jordan; rather, he was going to get married and then move with his wife.  **ALEBBINI** then stated they were in the "implementation phase" and that his own wife, D.E., knows what is being planned.

ii.      **ALEBBINI** said he will be leaving in one week on a train from Cincinnati to Virginia.

iii.      **ALEBBINI** said: "They want us to fight them.  They wish that we come down to the ground. . . The situation is not easy. . . They also thinking that Arabs are sheep and do not realize that is really happening and that the resistance is growing and they are feeding it, and the people want their freedom, and they want one country, and one decision."  He later added, "The best choice is the Islamic State, best choice for the Muslims.  The Islamic State and the Mujahid in Syria."  He also decried that there was a heinous war being waged on ISIS.

iv.      **ALEBBINI** also stated that he will throw away his Permanent Resident "Green Card" one day, because he believes he was living amongst apostates who kill Muslims and that it will be used against him on judgment day.

v.      **ALEBBINI** stated he wanted to follow R.A. and there was a good

chance that Q.A. would follow too.  He said he would go and make sure the "group" is right first, seemingly referring to the prior discussion of ISIS.

vi.  **ALEBBINI** spoke at length about ISIS and the perceived righteousness of ISIS's activities. **ALEBBINI** then added that he would rather stay 10 years in prison than 1 year in America.  If he became a prisoner, **ALEBBINI** stated he could at least say that he tried to support the cause, but he was prevented from doing so.  He further lamented that others are going to fight for ISIS, "while we are sitting here."

vii.  At the end of the meeting, **ALEBBINI** reiterated that, like he told Q.A., **ALEBBINI** will be the first to go "look for a way and see what the story is. . . If anything happen to me, you see and learn.  If nothing happen to me and group turns out to be right, on the phone . . . and then you spread . . . Anticipate that there will be a call."

**ALEBBINI** stated the CHS should go through Turkey because he has no interest in Amman.  **ALEBBINI**, however, stated he will go to Jordan and see family that lives in Irbid, a town that is near an ISIS border.  The CHS asked **ALEBBINI** if he is afraid about being questioned when he goes over the border (presumably to ISIS).

**ALEBBINI** said no because "Abu Bakr al-Bhagdadi called."[6]

s.  On or about March 28, 2017, the CHS and **ALEBBINI** met for breakfast. During the consensually recorded conversation, **ALEBBINI** received a

16

phone call.  **ALEBBINI** went outside to speak on the phone.

**ALEBBINI's** demeanor changed after his return.

t.      Later that same day (March 28, 2017), the CHS and **ALEBBINI** went

fishing.  During the consensually recorded conversation, **ALEBBINI** told

the CHS that he learned R.A. had been arrested by Jordanian authorities.

**ALEBBINI** believed that the arrest occurred because there was a meeting

of Middle Eastern leaders in Jordan, so the authorities were arresting a lot

of people.  **ALEBBINI** also said he believed the Jordanians must have

received information about R.A. from the United States, or from videos

that R.A. might have watched.

u.      On or about March 29, 2017, **ALEBBINI** met with the CHS for

approximately 77 minutes.  During the conversation, which was

consensually recorded, **ALEBBINI** and the CHS discussed **ALEBBINI**'s

travel plans, including his plans to travel by train to Washington, D.C.

**ALEBBINI** then intended to travel from Washington, D.C., to Jordan,

where he could continue to Syria and fight with ISIS.  **ALEBBINI**

indicated his plan was to leave at approximately 3:00 a.m. on Friday

morning, the context indicating that he was referring to Friday, March 31,

2017.  **ALEBBINI** indicated that his family knows that he (**ALEBBINI**)

wants to join ISIS, but that his family is against him joining ISIS and, for

that reason, took his passport.

v.      **ALEBBINI** indicated that when he joins ISIS, it will be to please God.

They ended the conversation with a discussion of **ALEBBINI's** intentions

---

[6] Abu Bakr al-Bhagdadi is the claimed leader of ISIS.

regarding his travel overseas, with **ALEBBINI** indicating that his intention was to fight with ISIS for the purpose of fighting against the Syrian leadership. **ALEBBINI** explained: "Our duty is to support the Islamic State. Those are the words, what is your duty? Jihad. A person is supposed to stay away from the people of sins . . . and what happens, happens . . . caught? Let them arrest you, then, let them arrest me. This is the true conversation."

w.     Consistent with the conversations above, information from Amtrak confirms that **ALEBBINI** obtained a ticket to travel by Amtrak train from Cincinnati, Ohio, to Washington, D.C., departing on March 31, 2017, at approximately 3:30 a.m.

x.     Based on physical surveillance, it is believed that **ALEBBINI** did not leave his residence overnight, and he did not board, or otherwise travel on, the above-mentioned scheduled train.

y.     On or about April 3, 2017, **ALEBBINI** met with the CHS for approximately 40 minutes. Q.A. joined them after the first 20 minutes of the meeting. During the consensually recorded conversation, **ALEBBINI** stated that he got into "100 argument" with his cousins because he told them he "will be going down to Jihad". The CHS asked **ALEBBINI**: "Okay, what happened to the ticket your brother booked for you?" **ALEBBINI** responded: "We canceled that one. Because I wanted to go there, now the passport is with me." **ALEBBINI** further stated that he let his cousin know his intentions, so if he is arrested by the Jordanian

officials, his family "can see what they can do to take me out."

**ALEBBINI** stated that he told his cousins that "my wife will [be] coming to Jordan and raise my son there. If I die, she does not want to be divorced in America, she decided to come to Jordan." **ALEBBINI** stated: "Because. . . to be honest, before I was planning anything, I decided to go fight in Jihad, the same way Umar Ibn al-Khattab did." **ALEBBINI** instructed the CHS that the best plan for travel is to book a Turkish airline flight to Jordan going through Turkey. Then, during the layover in Turkey, instead of boarding the flight to Jordan, "you take yourself and leave". **ALEBBINI** later stated: "I do not have money, I swear, from where can I --." The CHS responded: "I told you we will manage the situation. This is not a problem." **ALEBBINI** stated: "We will manage the situation, okay, we will manage the situation, that is to say, til now I want to support them…." **ALEBBINI** later stated: "I . . . I was planning if I go there, I do not want to just support fighting the oppressors, we want to fight with weapons, with tongue, and we want to protect the Muslims." Later during the meeting, an unidentified male—who **ALEBBINI** referred to as his cousin and to whom **ALEBBINI** was communicating with via audio text in the presence of the CHS—could be heard on the phone quoting the ISIS motto "remaining and expanding, God willing," and saying that he (the unidentified male) will be looking for **ALEBBINI** when he comes and to not fear or hesitate. **ALEBBINI** stated that even if he joins Al-Dawlah (ISIS) and only fires a couple shots before he is killed,

19

it would be good, because he would be inciting the faithful.

z.    On or about April 4, 2017, **ALEBBINI** met with the CHS for approximately 10 minutes. During the consensually recorded conversation, **ALEBBINI** and the CHS discussed airline flights on Turkish Airlines. The CHS asked **ALEBBINI** if he wanted to travel together. **ALEBBINI** stated that he would like to do so, but **ALEBBINI** expressed concern that if they go together, he does not want anything bad to happen to the CHS. **ALEBBINI** went on to state that the CHS could decide, but **ALEBBINI** would be going, with or without the CHS. **ALEBBINI** then asked the CHS for a loan, because he did not have the money for a ticket. **ALEBBINI** stated he had asked his cousin for help the day prior, but his cousin told him to forget about it. **ALEBBINI** stated he would "write a paper," and if he died, his cousins or his brothers would pay his debt.

aa.    On or about the evening of April 4, 2017, the CHS met with **ALEBBINI** and Q.A. at their residence. During the consensually recorded conversation, the CHS brought up their conversation from earlier in the day and began to ask **ALEBBINI** if he was sure about the plan. **ALEBBINI** changed the subject and stated that R.A.'s family had received news that R.A. would be released soon from jail in Jordan. **ALEBBINI** stated that R.A.'s family had received this information from a high-ranking Intelligence Services officer.

bb.    On or about the evening of April 6, 2017, the CHS met with **ALEBBINI**

and Q.A. at their residence. The conversation was consensually recorded. During a discussion of the Islamic State and the current conflict in the Middle East region, **ALEBBINI** contrasted the defeat in Palestine to the resistance in Mosul and said that the Islamic State has been holding steadfast against attacks from U.S., Russia, Shi'ites, and Arab nations. Q.A. stated that the Islamic State has not been holding off anyone and asked if the United States is incapable of beating the Islamic State. **ALEBBINI** screamed in response, and stated that the United States is incapable and asked who forced the United States to leave Iraq. **ALEBBINI** then said that the Islamic State has weapons now and is wreaking havoc, and that the Islamic State has built a complicated tunnel system.

cc.   On or about the evening of April 8, 2017, the CHS met with **ALEBBINI** and Q.A. at their residence. During the consensually recorded conversation, **ALEBBINI** discussed how R.A. was in jail in Jordan, and **ALEBBINI** explained that he believed R.A. would tell Jordanian officials that he and **ALEBBINI** had watched videos, got foolish and wanted to go to the Islamic State. **ALEBBINI** added that the Jordanian officials knew that R.A. wanted to go to the Islamic State when R.A. started to ask about the matter of how to get there. Later in the meeting, **ALEBBINI** discussed a statement issued by the Islamic State, addressed to Jordan, vowing to come for King Abdallah, and how the Islamic State beheaded four Syrians who were trained by the Jordanian government. **ALEBBINI**

21

also explained that many Jordanians were joining the Islamic State and that the Jordanian government would not be able to handle it when its citizens returned to Jordan from Syria. Later in the conversation, Q.A. stated to the CHS, "When Laith and [R.A.] came… go, go, go, go, to be honest I was planning to go with them. I am supposed to go ahead of them. That was the intention. But I divorced and problems happened."

dd. On or about the evening of April 18, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, **ALEBBINI** stated his father would not purchase a ticket for him to travel to Jordan, and **ALEBBINI** asked whether the CHS would give him money for a ticket. The CHS suggested that **ALEBBINI** get a credit card, or a loan from Q.A. or someone else, and the CHS could pay off the debt after **ALEBBINI** left the United States. **ALEBBINI** discussed the Islamic State and how 4,000 persons from Jordan were fighting with the Islamic State. **ALEBBINI** stated, "My goal is – my goal is not to go just to Al-Dawlah (ISIS). My goal is to be active in Al-Dawlah (ISIS)."

ee. On or about March 2, 2017, the FBI contacted **ALEBBINI** by phone after learning that **ALEBBINI**'s former residence in Virginia had been vacated. During the phone interview, **ALEBBINI** confirmed that he had moved from Virginia to Dayton, Ohio, and he provided his new address to the FBI. **ALEBBINI** told the FBI that he would be receptive to a follow-up interview, in person, if necessary. The FBI did not thereafter seek to contact **ALEBBINI**; however, on Saturday, April 15, 2017, **ALEBBINI**

22

contacted the FBI about the status of the FBI's investigation and asked

about his ability to travel overseas. The FBI returned **ALEBBINI**'s call

and left a voicemail telling **ALEBBINI** that the FBI's investigation did

not prohibit **ALEBBINI** from traveling. On or about the evening of April

18, 2017, **ALEBBINI** told the CHS about his contact with the FBI.

ff.    On or about the evening of April 19, 2017, the CHS met with **ALEBBINI**.

During the consensually recorded conversation, the CHS asked

**ALEBBINI** how much money he needed and **ALEBBINI** stated that he

only needed enough for his ticket. With prior approval from the FBI, the

CHS stated that he would give the money to D.E. as a bonus.[7]

**ALEBBINI** said he was going to book the cheapest flight and stated that

he was ready to travel. **ALEBBINI** indicated that he would book a flight

from Cincinnati to Chicago, and then from Chicago to Jordan. **ALEBBINI**

stated that if he was unable to get into Turkey, he would go to Jordan, and

from there, his father could help him. **ALEBBINI** added that once he

entered Jordan, he would not remain in his father's home until he is

arrested, instead, he would flee to Sal (a village in northern Jordan).

**ALEBBINI** suggested that he might be arrested at the airport.

gg.    On or about April 21, 2017, the CHS met with D.E., who stated that

**ALEBBINI**'s family was now unwilling to purchase a ticket for D.E.

With prior approval from the FBI, the CHS discussed with D.E. a bonus of

---

[7] D.E. has been employed at a business operated by the CHS since on or about March 16, 2017.
D.E. had been employed by the CHS at the same business in prior years.

$1500, to be used to purchase two tickets on Turkish Airlines. The conversation was consensually recorded.

hh. On or about April 22, 2017, the CHS met again with D.E. and, with prior approval from the FBI, gave D.E. $1500 (which funds the FBI provided). The CHS cautioned D.E. not to discuss the money with anyone because of what **ALEBBINI** was planning to do (*i.e.*, traveling for the purpose of joining ISIS). D.E. acknowledged this and agreed. The conversation was consensually recorded.

ii. On or about April 24, 2017, the CHS met again with D.E. During this meeting, the CHS gave D.E. her final wages for her work, which included pre-payment for her scheduled hours on April 25, 2017. The CHS also gave D.E. a bonus of $200 as a going-away bonus for being a good employee. The CHS previously gave similar bonuses to D.E. and other employees in the past.

jj. On or about April 25, 2017, the CHS met again with D.E. During the meeting, D.E. stated, "And I know whatever happens, I know I say . . . we're going together, uh, I don't know, but I know there are gonna be questions." D.E. then stated, "When Laith gets, cause he's not going to Jordan." D.E. then stated, "If they do though, I know I am supposed to ask for the Embassy, right? Yeah, that's the first thing I do, if I'm questioned, I will, talk to the Embassy. But if they do, I don't know nothing, I just, we planned on going together and then he just disappeared. If I am questioned." The CHS then stated: "yeah if he gets down in

24

Turkey, what are you going to tell them?" D.E. responded: "Mmm, hmm, that I don't know, like, we booked the tickets together and you know . . . ." D.E. then stated that she would tell them that he watched YouTube videos. The CHS then asked D.E. if **ALEBBINI** told her to say that. D.E. responded, "mmm, Yes."

26.     On or about April 24, 2017, I received information from the United States Department of Homeland Security showing that tickets have been issued in the names of "Lath Alebbini" and D.E. for travel as passengers on flights from and to the following locations on the following dates: (1) from Cincinnati-Northern Kentucky International Airport to Chicago O'Hare International Airport on April 26, 2017 (Turkish Airlines Flight 9576 operated by United Airlines under Flight 1560); (2) from Chicago O'Hare International Airport to Ataturk International Airport (located in Istanbul, Turkey) on April 26, 2017 (Turkish Airlines Flight 6); and (3) from Ataturk International Airport to Queen Alia International Airport (located in Amman, Jordan) on April 27, 2017 (Turkish Airlines Flight 812). Records indicate that the tickets were purchased using a Visa card under D.E.'s name, and that the purchaser provided a telephone number and email address associated with D.E. in connection with the reservation. The email address provided was "destiney.eshelman@gmail.com."

27.     On or about April 26, 2017, at approximately 2:00 p.m., **ALEBBINI** and D.E. left their residence and traveled to the Cincinnati/Northern Kentucky International Airport. D.E.'s relative drove them to the airport. **ALEBBINI** and D.E. proceeded to the United Airlines ticket counter, where they obtained their boarding passes. After **ALEBBINI** obtained his boarding passes and walked towards TSA security, law-enforcement officers arrested him. Law-enforcement officers advised **ALEBBINI** of his Miranda rights after his arrest.

28.     Law-enforcement officers subsequently sought to interview **ALEBBINI** at FBI's office in Cincinnati. The interview was video and audio recorded. **ALEBBINI** once again was advised of his Miranda rights. **ALEBBINI** expressed an understanding of his rights and agreed to speak with law-enforcement officers. He signed a Miranda-waiver form. During the interview, **ALEBBINI** admitted that he intended to travel to Turkey and then join and fight for ISIS. During the interview, **ALEBBINI** admitted that he used D.E.'s account to watch ISIS videos on YouTube.

29.     At the time of his arrest, **ALEBBINI** had a black BLU cell phone with a cracked screen in his pocket. Law-enforcement officers seized the BLU cell phone incident to **ALEBBINI**'s arrest. After the FBI arrested **ALEBBINI**, the FBI conducted a voluntary interview with D.E. During the interview, D.E. indicated that in April 2017, D.E. and **ALEBBINI** traveled to Richmond, Indiana, where they sought to obtain a replacement for the BLU cell phone at a Best Buy store, that D.E. performed a factory-reset on the BLU cell phone believing the BLU cell phone would need to be turned in before a replacement phone would be provided, but that **ALEBBINI** did not care for the replacement phone, and, accordingly, that **ALEBBINI** opted to retain the BLU cell phone and not replace it. During his post-arrest interview, **ALEBBINI** confirmed this account and that the BLU cell phone was his phone. The CHS also indicated that the CHS observed **ALEBBINI** using a cell phone with similar characteristics as the BLU cell phone. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://BLUproducts.com/studio-g, I know that the BLU cell phone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

30.     During the interview with D.E. at the time of **ALEBBINI**'s arrest, the FBI

inquired about the whereabouts of **ALEBBINI**'s laptop, and D.E. indicated that it was in the

duffle bag that D.E. had checked with the airline.  After being provided access to the duffle bag,

D.E. agreed to provide the laptop to the FBI.  D.E. removed an HP laptop computer from the

duffle bag with model number 15-1233wm, and bearing serial number appearing to be

5CD537AD81, and she provided the laptop to the FBI.

31.     During a subsequent voluntary interview on or about May 4, 2017, D.E. told the

FBI that D.E. and **ALEBBINI** shared the BLU cell phone until approximately March 14, 2017,

and that during the shared use, the BLU cell phone was logged into D.E.'s Google account.  D.E.

stated that on or about March 14, 2017, D.E. obtained a new phone and **ALEBBINI** continued to

use the BLU cell phone.  D.E. stated that for approximately two weeks following D.E.'s receipt

of the new phone, **ALEBBINI** continued to use D.E.'s Google account (*i.e.*:

DestineyEshelman@google.com) on the BLU cell phone.  D.E. stated that at some point

following the approximate two-week period, D.E. set up a separate Google account for

**ALEBBINI** to use on the BLU cell phone.  D.E. stated the Google account she established for

**ALEBINNI** was laithelibini90@gmail.com (the SUBJECT ACCOUNT).

32.     On or about June 27, 2017, Google, Inc. responded to a grand-jury subpoena

seeking account information for the SUBJECT ACCOUNT.  Information provided by Google,

Inc., in response to the subpoena, showed that the subscriber of the SUBJECT ACCOUNT is

"Laith Alebbini."  The information provided by Google, Inc., also showed that, among others,

the following services were associated with the SUBJECT ACCOUNT:  Android, Gmail, Google

Calendar, Location History, Web & App Activity, and YouTube.

33.     On May 11, 2017, FBI submitted a letter to Google, Inc., requesting that Google,

Inc., preserve information related to the SUBJECT ACCOUNT for a period of 90-days.

34.     Based on my training and experience, I am aware that individuals involved in attempting to provide, or providing, material support and resources to foreign-terrorist organizations often communicate with others involved in similar conduct via e-mail, social-media accounts such as Google+, and online chat programs.  I also know based on my training and experience that individuals associated with such activities use YouTube to watch videos and images relating to ISIS and other foreign-terrorist organizations.   Those individuals obtain and share such videos and images with each other via a variety of means, including email, social-media accounts, and online-chat programs.  Based on my training and experience, I know that individuals involved in material-support offenses often use multiple accounts, aliases, and means to communicate.  These multiple accounts or aliases are used as a means to avoid detection from law enforcement.

35.     As discussed in the paragraphs above, **ALEBBINI** admitted to the FBI in January 2017 that he posted pro-ISIS videos to a Facebook social media page.   On or about March 9, 2017, **ALEBBINI**, the CHS, and others watched a video on YouTube that was titled: "The Islamic State, A to Z in 15 minutes."  During a meeting on or about April 3, 2017, **ALEBBINI** communicated by cellular phone with an unidentified male using audio text in the presence of the CHS, and the unidentified male could be heard quoting the ISIS motto.   On April 26, 2017, **ALEBBINI** had a black BLU cell phone on his person when arrested at the airport.  When interviewed after his arrest, **ALEBBINI** admitted that he used D.E.'s Google account to watch pro-ISIS videos.   Later, D.E. confirmed that she established the SUBJECT ACCOUNT for **ALEBBINI** on the BLU cell phone, and that she and **ALEBBINI** had previously shared the use of her Google account.  Following the arrest of **ALEBBINI**, the FBI also recovered a laptop,

28

identified by D.E. as belonging to **ALEBBINI**, from a duffle bag.

36.     Based on my training and experience, I know that many social media accounts and Internet websites require users to provide their email account when registering for the accounts. The social media account providers and Internet providers then send the users various notifications regarding messages from other users, information accessed by users, information available by the websites, and other information. These messages can provide evidence in cases involving material support offenses because they help in identifying what social media and Internet accounts were utilized by the subjects to communicate with other subjects. In addition, the messages help in identifying the identities of other subjects.

37.     Also, as noted above, email providers maintain various subscriber and user information that its users provide when registering for its accounts. Some email providers also require payment for certain services or features. Such information is materially important in cases where online accounts are utilized in connection with attempting to provide or providing material support to a foreign terrorist organization, as this information can help in confirming the identity of the individuals using the accounts and committing the offenses. Email providers maintain various logs of IP addresses utilized to access the accounts. The IP information is again materially important in material support investigations. This information helps in identifying the subjects and the locations where their computer devices are located.

38.     Google has the ability to maintain information associated with the web and application history of its users and the location history of its users. Such information is materially relevant in material support investigations, as it may help in identifying websites and applications used or accessed by subjects in relation to the offense, as well as locations involved in the offense.

29

39.     Google Android Backup provides users with the ability to backup data on their cellular telephones and other electronic devices.  Such data can be materially relevant in cases in which cellular telephones and other electronic devices are used to commit or in connection with material support offenses, as this data may provide historical records of their criminal activities that are no longer saved on the devices.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

40.     I anticipate executing the requested warrant for the listed account under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Google, Inc. to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

41.     Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign terrorist organization) have been committed by **ALEBBINI**, and that there is probable cause to believe that, present within the information associated with the SUBJECT ACCOUNT, as described more particularly in Attachment A, is evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B.

42.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

43.     Because the warrant for the account described in Attachment A will be served on Google, Inc., who will then compile the requested records at times convenient to that entity, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Special Agent Michael Herwig
Federal Bureau of Investigation


SUBSCRIBED and SWORN before me this 16th day of August 2017.

MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A

This warrant applies to information associated with **laithelibini90@gmail.com**, which is stored at premises controlled by Google Inc., a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

**ATTACHMENT B**
**Particular Things to be Seized**

I.    **Information to be disclosed by Google Inc. (the "Provider")**

　　　To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any e-mails, records, files, logs, or information that has been deleted, but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for the SUBJECT ACCOUNT:

1.    The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

2.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

3.    The types of service used;

4.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

5.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

6.    Subscriber registration information;

7.    Sign-in IP addresses and associated time stamps;

8.    Video upload IP addresses and associated time stamps;

9.    Copies of private videos and associated video information, to include any deleted videos;

10.   Private message contents and comments, to include any deleted messages or comments;

1

11.    Public message contents and comments, to include any deleted messages or comments;

12.    YouTube search history;

13.    Information that refers or relates to subscriber and registration information;

14.    Information that refers or relates to internet history, including browser history, and app history, including app data;

15.    Informaton that refers or relates to IP logs associated with the internet history and app history;

16.    Google search history;

17.    Google browser activity (including activity on Google Chrome);

18.    Any available backup data for any electronic devices;

19.    Information that refers to Google change history and change information;

20.    Cellular device information, including IMEI/MEID, make and model, serial number, date and IP address of last access to Google, and a list of all accounts that have ever been active on the device;

21.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

22.    For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored; and

23.    Any cookies-related information concerning the account.

24.    Google Play purchase history and transactional records, including payment method(s) and related billing information;

25.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

26.    For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored;

27.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures,

2

and files; and

28.    Location history

Pursuant to the warrant, Google, Inc., shall disclose responsive data by sending it to the Federal Bureau of Investigation, or making the data available to the Federal Bureau of Investigation via Google, Inc.'s, electronic portal within 14 days of the issuance of this warrant.

## II.    Information to be seized by the government

1.    All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of offenses involving providing, conspiring, or attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, involving the user of the account, and occurring from January 1, 2016, to the present, for each account or identifier listed on Attachment A, information referring, relating, or pertaining to the following:

   a.    Email, text, and other messages, photos, videos, contacts and contact lists, addresses and address books, voicemail messages, location data, calendar, applications and application data, settings, location data, web-search history, YouTube search history, YouTube comments, and other related social-media platforms;

   b.    Records and information referring, or relating, to ISIS, or any other foreign terrorist organizations;

   c.    Records and information referring, or relating, to the provision, or attempted provision, of material support or resources to ISIS, or any other foreign terrorist organizations;

   d.    Records and information referring, or relating, to travel, including travel plans, itineraries, reservations, bookings, tickets, and the means and sources of payment for travel;

   e.    Records and information referring, or relating, to plans to commit a terrorist attack, or to fight with ISIS, or any other foreign terrorist organizations, including, without limitation, funding, materials, maps, disguises, aliases, weapons, or other materials that may assist with an attack;

   f.    Records and information referring, or relating, to communications with others relating to ISIS, or any other foreign terrorist organizations, or potential terrorist attacks on the United States, or in other countries;

   g.    Records and information relating to the use of YouTube, Facebook, WhatsApp, and other forms of social media, use of the internet, and communication methods, including private messaging, where such information refers or relates in anyway to ISIS, or any other foreign terrorist organizations;

3

h.  Records and information referring, or relating, to videos or other content created, publicly posted, or viewed on the internet where such content concerns ISIS, or any other foreign terrorist organizations;

i.  Communications involving, referring, or relating to potential co-conspirators, accomplices, and associates, concerning ISIS, or any other foreign terrorist organizations, or relating to providing, or attempting to provide, material support or resources for such organizations;

j.  Identifying information and contact information of potential co-conspirators, accomplices, associates, and other individuals engaged, or otherwise involved, in providing, or attempting to provide, material support or resources to ISIS, or any other foreign terrorist organizations;

k.  The timing of communications among potential co-conspirators, accomplices, associates, and other individuals engaged, or otherwise involved, in providing, or attempting to provide, material support or resources to ISIS, or any other foreign-terrorist organizations;

l.  Information referring, or relating to, the methods and techniques used in providing, or attempting to provide, material support or resources to a foreign-terrorist organization;

m.  The distribution of videos and photographs referring, or relating to, the work, accomplishments, or propaganda of a foreign-terrorist organization;

n.  Information referring, or relating to, the recruitment of fighters, supporters, and financial support for a foreign-terrorist organization.

o.  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

p.  Records and information indicating the account user's state of mind as it relates to the provision, or attempted provision, of material support or resources to ISIS, or other foreign terrorist organizations;

q.  Records of Internet Protocol addresses used;

r.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

s.  The identity of the person(s) who created, used, or deleted the email account, including information that would help reveal the whereabouts of such person;

4

t.   The identity of any person(s) who communicated with the email account about matters relating to foreign-terrorist organizations, and any records related to the whereabouts of such persons;

u.   Records indicating that data has been deleted by the account owner, potentially to hide evidence of a crime; and

v.   Account history (including Terms of Service and any complaints) and billing records (including date, time, duration, and screen names used each time the accounts were activated).

2.   Evidence of user attribution showing who used, or owned, the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.